Justice JONES
Dissenting.
I dissent because of the unfortunate lessons that can be drawn from this decision. One such lesson is that a seller of goods need no longer obtain a personal guarantee or pierce the protective veil of a limited liability entity in order to hold a representative of the entity personally liable for a purchase. The seller needs only to get the representative to sign a confusing, one-size-fits-all contract, doing away with the bother of asking for a personal guarantee or the tedious business of proving the entity’s shield of liability should be disregarded. Another lesson is that the seller may poop away a security interest in goods that are worth much more than the indebtedness and still nail the representative with personal liability. We need not teach these unfortunate lessons because the district court’s decision is based on faulty factual and legal analysis and is deserving of reversal.
*618 I.
As the Court points out, where both parties have moved for summary judgment in a case scheduled for court trial the trier of fact is entitled to arrive at the most probable inferences based upon the undisputed evidence properly before it. The test for reviewing the inferences drawn by the trial court is whether the record reasonably supports the inferences. Shawver v. Huckleberry Estates, LLC, 140 Idaho 354, 360-61, 93 P.3d 685, 691-92 (2004). If the record does not reasonably support the inferences drawn by the trier of fact, the summary judgment should not be permitted to stand. With regard to matters of law, this Court exercises free review. Lettunich v. Key Bank Nat. Ass’n, 141 Idaho 362, 366, 109 P.3d 1104, 1108 (2005).
The district court committed legal error in construing the Commercial Sales Agreement, Security Agreement, and Financing Statement together as if they constituted the agreement between the parties. While contemporaneous instruments executed by the same parties and having relation to the same subject matter must be construed together as parts of one agreement (Hill v. Schultz, 71 Idaho 145, 148, 227 P.2d 586, 589 (1951)), that situation is not present here. In this case there were two distinct transactions — entry of the parties into the Commercial Sales Agreement, which occurred on March 15, 2000, and execution of the Security Agreement and Financing Statement, which occurred about 45 days later. The documents certainly were not contemporaneous. And, the subsequently executed documents substantially changed the character of the transaction. The Commercial Sales Agreement contemplated an unsecured transaction where payment would be made in “30 days or 15th of next mo.” When it became apparent that Hogs ‘N Kisses was not going to be able to pay upon those terms, Simplot asked for and received a security interest in the crops of both Hogs ‘N Kisses and Clair Bosen, thus eliminating the 30-day payment requirement. Rather than being part of the initial agreement, the Security Agreement and Financing Statement were a completely separate transaction and they essentially modified the initial agreement. It was error for the district court to construe the documents together. Indeed, the district court erred in considering the Security Agreement and Financing Statement as extrinsic evidence of the parties’ intent in entering into the Commercial Sales Agreement.
The Court somewhat distances itself from the district court’s conclusion that the three documents must be construed together, but the Court is incorrect in considering the Security Agreement and Financing Statement in determining the intent of the parties in entering into the Commercial Sales Agreement. “The purpose of interpreting a contract is to determine the intent of the contracting parties at the time the contract was entered.” Shawver, 140 Idaho at 361, 93 P.3d at 692. Here, the parties encountered a change in circumstances and entered into a subsequent contract 45 days later for the purpose of modifying their initial agreement. As a general matter, the subsequent contract would not shed a great deal of light on the intent of the parties at the time of the initial contract. Rather, one would find better guidance as to the parties’ intent by examining the pertinent facts as of the initial contracting date.
Since the district court erroneously construed the documents together and drew inferences as to the intent of the parties in entering into the Commercial Sales Agreement, based upon language in the Security Agreement and Financing Statement, we do not particularly know what inferences the district court would have drawn had it focused strictly on the Commercial Sales Agreement. For instance, the district court determined that since Mr. Bosen is shown as debtor on the Financing Statement, he intended to be a party to the Commercial Sales Agreement. One can pledge his property as security for an obligation without becoming bound on the obligation itself. Had the district court properly focused on the Commercial Sales Agreement to determine whether or not Mr. Bosen was bound as a party, a different outcome would have been warranted.
*619 The form and content of the Commercial Sales Agreement leaves much to be desired.[3] The bulk of the form deals with the “customer” and seeks information about the customer’s address, telephone number, type of ownership, names and addresses of principals, farming information, and lending status, both business and personal. The final part of the form employs the word “applicant” and makes it clear that the applicant will be responsible for payment of any bills incurred by the customer. The form has a signature line for the applicant, as well as a signature line for a spouse or “other owner”. There is no request for the person signing to specify any representative status, e.g., as a member of a limited liability company, officer of a corporation, partner of a partnership, trustee of a trust, or otherwise.
The district court believed that because Mr. Bosen signed the form without indicating he was signing in a representative capacity, he had thereby obligated both himself and Hogs ‘N Kisses (since it was named as the customer) as parties to the contract. Although the district court indicated that it had reached this conclusion without referring to extrinsic evidence, a review of the court’s rulings on the summary judgment and reconsideration motion indicates otherwise. Since Hogs ‘N Kisses was not a party to this action, the district court’s conclusion regarding the limited liability company’s liability under the contract might be considered superfluous. However, it does raise a good point. The Court concludes that Mr. Bosen obligated himself as a party to the contract because he did not provide the information, which was not sought by the form, as to whether he was signing in a representative capacity. Assuming the Court is correct, was Hogs ‘N Kisses obligated under the contract?
The Court believes that the Mr. Bosen obligated himself, personally, by not stating that he was signing in a representative capacity. If he was not signing in a representative capacity, it would seem that the customer, Hogs ‘N Kisses, could not be obligated under the contract. That would indeed be an absurd result. The form asks for no information about the applicant. However, it wants to know a substantial amount about the customer, including business and personal banking information, the last fertilizer/chemical supplier, farming information, and other information that would be pertinent in determining the creditworthiness of the customer. The result reached by the court — that despite all of the foregoing, Mr. Bosen was obligated personally because he did not indicate he was signing in a representative capacity, something the form did not ask for — would produce the anomalous result that the signer of the contract was obligated, while the customer was not, except in the instance where a sole proprietor was involved. It appears to be rather obvious, viewing the document within its four corners, that customer and applicant are synonymous. Otherwise, if the applicant and customer are different persons, there is no language in the form that imposes liability upon the customer. If Simplot wanted to know the capacity in which someone representing an entity was signing the contract, it should have requested that information. It is my experience that people do not answer questions that forms do not pose nor provide information that forms do not request. If Simplot was uninterested in knowing the signing party’s capacity, it should not be able to impose personal liability on a non-customer signer. The form does ask for the names and titles of principals, presumably of entity customers, and this information should be considered in determining the capacity or authority of the person signing on behalf of the entity customer/applicant. Ideally, as is the case with many lending institutions, a separate form would be made available to an individual or sole proprietor and another, different form would be made available to a contracting entity. By using a one-size-fits-all form, Simplot created confusion from which it now seeks to benefit.
When Mr. Bosen received the Simplot form, he indicated on it that Hogs ‘N Kisses *620 was the customer, and that it was a limited liability company. Brian Davis, the Simplot employee who dealt with Mr. Bosen in this matter, acknowledged that he knew he was dealing with a limited liability company “that had been formed to protect the members.” In recognition of this fact, when Mr. Bosen received the form, language had been added by Simplot that asked for the tax identification number, presumably of the limited liability company.
I find nothing within the four comers of the document, either as Simplot presented it to Mr. Bosen, or as Mr. Bosen completed it, that would justify a holding that Mr. Bosen, rather than Hogs ‘N Kisses, was obligated as customer and applicant.
If it is necessary to examine extrinsic evidence in order to determine Mr. Bosen’s liability, I believe the same result would obtain. In making the examination one must be mindful that “a contract should be construed most strongly against the party preparing it or employing the words concerning which doubt arises.” Big Butte Ranch, Inc. v. Grasmick, 91 Idaho 6, 9, 415 P.2d 48, 51 (1966). It was Simplot, not Mr. Bosen, who prepared the contract form. Simplot made the unfortunate change in terminology from “customer” to “applicant”, requested the entity tax identification number, and did not ask that any person signing the form insert a representative capacity.
Other evidence leads to the conclusion that Simplot was looking to Hogs ‘N Kisses as the party obligated under the Commercial Sales Agreement. Prior to the signing of the contract, Brian Davis acknowledged to an employee of Hogs ‘N Kisses that “he realized that this was a large organization that [another Simplot employee] had told him that it was a large organization with a butt load of money, not to worry about it.” Mr. Davis was speaking of an organization, the limited liability company, rather than Mr. Bosen, an individual. Mr. Davis went on to tell the Hogs ‘N Kisses employee that Simplot would need a hen on something, but nothing was arranged in that regard prior to execution of the Commercial Sales Agreement. Indeed, the Commercial Sales Agreement was unsecured. It called for payment within 30 days, which would render a security interest in growing crops superfluous (unless they were of the extremely fast-growing type).
Under the Commercial Sales Agreement, the “applicant” agreed to pay the total amount due on “each invoice/customer statement.” Simplot sent its billings for fertilizer purchases to Hogs ‘N Kisses “in care of’ Clair Bosen at the farm property address, 2279 East Yale Road, Dedo, Idaho. Invoices were not sent to Mr. Bosen at his home address in Preston.
If inferences can reasonably be drawn from the execution of the security documents, the inferences would indicate that Mr. Bosen was not personally hable as a party on the Commercial Sales Agreement. When it turned out that Hogs ‘N Kisses did not have enough of a butt load of money to pay invoices on a 30-day basis, Simplot sought security. Although Mr. Davis did not recall talking to Mr. Bosen about the Commercial Sales Agreement, he did recall discussing the later-executed security documents. Mr. Bosen points out that, when asked how the account was estabhshed for Hogs ‘N Kisses, Mr. Davis rephed:
We obtained a Commercial Sales Agreement signed by Mr. Bosen. And, I don’t recall the specifics, but at some point I understood that they were not going to be able to pay the account net 30 days, according to our normal terms. So I agreed with Mr. Bosen that we would extend terms to harvest in return for security in the crops grown on the farm.
In response to the question, “So, in deciding to extend credit to Hogs ‘N Kisses, LLC, the only thing that you relied on in making that decision was that you would have a first position lien on the crops; is that correct?”, Mr. Davis replied, “On the crops owned by Mr. Bosen and Hogs ‘N Kisses, that’s correct.”
Mr. Davis was asked, ‘Was there a way, if you intended to extend credit to a limited liability company but you wanted to have the individual members liable for the credit extended, was there a way you could do that?” He replied, We could have taken a personal guarantee.” Mr. Davis then said it was not *621 necessary to obtain a personal guarantee from Mr. Bosen, “Because I had a lien on Mr. Bosen’s crops and Hogs ‘N Kisses’ crops.” In response to the question, “So, you didn’t talk with Mr. Bosen about him giving a personal guarantee because you felt that your credit was adequately protected by your lien on the crops in Cassia County; correct?”, Mr. Davis stated, “That’s correct.”
Thus, it becomes clear that when the Security Agreement was being discussed between the parties, Simplot was looking solely to the crops as the source of payment. Simplot obtained a security interest in all crops being grown, both by Hogs ‘N Kisses and Mr. Bosen, on the 5,100 acre Cassia County farm. Of further interest, is the fact that neither in Simplot’s initial complaint nor in its amended complaint is there any mention of the Commercial Sales Agreement. However, the amended complaint recites that “defendant” granted a security interest in all crops growing or to be grown on their property and signed a UCC-1F “to secure the security for the security interest granted.” The amended complaint seeks an accounting as to the location and disposition of the crops and proceeds, as well as judgment for the remaining balance owing for the fertilizer. The amended complaint focuses on the Security Agreement and Financing Statement, seeking recovery for breach of contract and accounting, including an accounting with respect to all crops and proceeds of Hogs ‘N Kisses.
As pointed out in the Court’s opinion, Mr. Davis apparently formed an opinion at some point that Mr. Bosen should be held personally liable on the Commercial Sales Agreement. It appears from Mr. Davis’ testimony that this occurred at some time after the parties had entered into the contract. When asked in his deposition whether he recalled talking with Mr. Bosen about the Commercial Sales Agreement, Mr. Davis replied, “I don’t.” He did not recall how he had obtained the Commercial Sales Agreement. While testifying that he thought Mr. Bosen understood he was obligated on the contract, he couldn’t quite bring himself to say that he had expressed to Mr. Bosen that he was looking to him for personal responsibility under the contract. When asked, “Did you ever tell Mr. Bosen that you thought that he would be personally liable for the fertilizer bill from Simplot to Hogs ‘N Kisses, LLC?,” he responded, “I don’t recall specifically having that conversation.” As the Court notes, “a party’s subjective, undisclosed intent is immaterial to the interpretation of a contract.” Mr. Davis may have decided at some point, possibly after the suit was filed and the security disposed of, that Mr. Bosen should be held personally liable on the Commercial Sales Agreement but it does not appear that he ever specifically stated such intention to Mr. Bosen or that he obtained Mr. Bosen’s agreement to such liability.
In sum, the only reasonable inferences that may be drawn from the record are that the Commercial Sales Agreement obligated Hogs ‘N Kisses as a contracting party, not Mr. Bosen, personally; that Simplot was initially looking to Hogs ‘N Kisses’ butt load of money as the source of payment for the fertilizer; that when Hogs ‘N Kisses was not able to pay the fertilizer bill as initially agreed, Simplot sought security from both Mr. Bosen and Hogs ‘N Kisses and received a security interest in all of their crops being grown on the property; that Simplot was looking solely to the crops as the source of payment of the fertilizer bills; that even if the Commercial Sales Agreement could be construed to make Mr. Bosen personally liable, the security documents modified it to make the crops the sole source of payment; and that the contrary inferences drawn by the district court are unsupported by the record and unreasonable.
II.
As noted, this action was initiated to enforce the creditor’s rights in a secured transaction. While Mr. Bosen did not contest the fact that he had obligated his barley crop as security for the Simplot fertilizer bills, he argued both below and before this Court that the extent of his liability was the crop security granted to Simplot, particularly the barley crop that he grew on the Cassia County property. At oral argument, it was disclosed that Simplot did receive the benefit of the Bosens’ barley crop. The record discloses that this fell short of satisfying the fertilizer *622 bill by $70,945.53. The record further discloses that well over $400,000 worth of hay was grown on the property, that Simplot had a security interest in the hay, and that Simplot purchased the hay. The record does not disclose whether or not Simplot paid less than the market value of the hay in order to exercise a set-off for the amount owing by Hogs ‘N Kisses or whether Simplot simply disregarded the rights it had in the hay under the Security Agreement. Mr. Bosen did not do a particularly comprehensive job of developing this argument.
In his motion for reconsideration, seeking to set aside the summary judgment in favor of Simplot, Mr. Bosen contended that Simplot should have set off the balance of the fertilizer account against the amount it paid for the hay. The district court denied the motion for reconsideration stating:
Bosen indicates that Simplot should have retained income from the hay to pay off their debt for the fertilizer. That argument is not persuasive since Simplot did not have a security interest in hay regarding money owed for chemical fertilizer, but only a security interest in barley.
The district court was mistaken because the Security Agreement granted Simplot a security interest in “[a]ll crops grown, or now growing, or to be grown”, on the 5,100 acre farm. Both the complaint and the amended complaint allege that Simplot was granted a security interest in all crops growing or to be grown on the property. Simplot didn’t necessarily need an accounting with regard to the hay crop because it bought, and gained possession of, the hay. The record contains a letter in which Simplot acknowledges that it was buying the Hogs ‘N Kisses hay, that it would begin hauling the hay in November 2000, and that hay would be paid for upon delivery to its feedlot. That being the case, it appears that Simplot had possession of the collateral before it paid for the hay. In an affidavit submitted in support of his motion for summary judgment Mr. Bosen pointed out that Simplot had “paid at least $418,211.60 to Hogs ‘N Kisses” after November 2000. Copies of the checks were attached, showing such payments which included over $100,000 paid for the hay in May 2001. During oral argument, Simplot’s counsel stated that “Simplot always looks to their collateral first” in collecting an account. There is no indication in the record as to whether Simplot did so in this ease — by paying less than the market value for the hay— although one might presume that this is not the case because Simplot is suing for a deficiency. If no setoff was exercised, one might justifiably ask why.
Under Article 9 of the Uniform Commercial Code, Mr. Bosen should not face a deficiency judgment because Simplot frittered away its security interest in the hay.[4] Simplot had validly attached a security interest in ah crops. I.C. § 28-9-203(1) (2000). The Financing Statement, which Simplot prepared and which omitted any mention of crops other than barley, is irrelevant because the Security Agreement controls the rights between the debtor and the secured party. I.C. § 28-9-201 (2000); Simplot v. William C. Owens, M.D., P.A., 119 Idaho 243, 244-245, 805 P.2d 449, 450-451 (1990). In any event, a security interest is perfected by the secured party’s taking possession of the collateral (former I.C. § 28-9-305), which Simplot did after November 2000 and before it paid for the hay. Simplot had knowledge of its rights in the hay and should have exercised them appropriately.
Because Simplot had a security interest in the hay, any sale of that hay should have gone to pay off Hogs ‘N Kisses’ debt. The company purchased the hay from Hogs ‘N Kisses at what should be described as a private sale. The secured party may buy the crop at a private sale “if the collateral is of a type customarily sold in a recognized market.” I.C. § 28-9-504(3) (2000). The proceeds apparently did not go to the fertilizer debt. Article 9 dictates otherwise. I.C. § 28 — 9—504(l)(b) (2000) (proceeds of disposition go first to reasonable expenses, then to “satisfaction of indebtedness secured by the security interest under which the disposition is made”); accord Stockdale v. Stockdale, 102 Idaho 870, 874, 643 P.2d 82, 86 (App.1982). Simplot should have recognized its security interest in the hay and exercised a set-off *623 from its purchase price. Because it failed to avail itself of that opportunity, the company should not be allowed to pursue this suit against Bosen in his individual capacity.
Aside from the application of the Uniform Commercial Code, one might wonder why Simplot did not mitigate its damages by taking advantage of the fact that it was the purchaser and possessor of the hay. It had the ability to make itself whole but failed to do so. Under such circumstances, it is hard to see why this Court should grant another bite at the apple.
III.
I would reverse the district court’s decision and remand with instructions to grant the Bosens’ motion for summary judgment.
[[Image here]]

. A copy of the first page of the Commercial Sales Agreement as submitted to Mr. Bosen by Simplot is appended hereto as Figure 1.

. Because the parties signed the Security Agreement in March 2000, the analysis will necessarily focus on “old" Article 9 of the Uniform Commercial Code. See I.C. § 73-101 (2006) ("no part of these compiled laws is retroactive, unless expressly so declared”). The Legislature largely replaced Article 9 in 2001. 2001 Idaho Sess. L. ch. 208.